In the Matter of John LAMMERS, d/b/a
Lammers Rice Mill and Lammers
Drier, Bankrupt.
No. LR-60-B-170.

United States District Court
E. D. Arkansas, W. D.
Oct. 30, 1962.

Robert D. Smith, U. S. Atty., for the Eastern District of Arkansas and Charles Mott, Jr., Asst. U. S. Atty., Little Rock, Ark., for petitioner.

H. Murray Claycomb, of Gregory & Claycomb, Pine Bluff, Ark., for respondent.

YOUNG, District Judge.

Commodity Credit Corporation filed its claim for $99,207.00 alleging that it was entitled to priority against the assets of the estate under 11 U.S.C.A. § 104 by virtue of 31 U.S.C.A. § 191. The Trustee objected to this claim; it was the Trustee's major contention that the claim by the Government was in fact a penalty, which is not entitled to priority under § 57, sub. j of the Bankruptcy Act, as amended. The Referee correctly, I think, states the problem to be whether or not the claim of Commodity Credit is a penalty.

The facts which gave rise to this litigation occurred in the following manner. On December 14, 1959 the Bankrupt and Commodity Credit entered into a contract whereby the Bankrupt would furnish rice to the Indonesian Relief Mission, and the Department of Agriculture and the Commodity Credit Corporation would subsidize Bankrupt for the difference in the domestic price and the foreign price (i. e., the price paid by the Indonesian Relief Mission). The subsidy which the Bankrupt would have received, had he not breached the contract, was to be negotiable payment-in-kind certificates which are redeemable (at market price) only for Commodity Credit rice or feedgrain. This contract provided that:

"* * * Inasmuch as failure of the exporter to export will cause serious and substantial losses to CCC, such as damages to CCC's export and price support programs, and the incurrence of storage, administrative and other costs, and it will be difficult, if not impossible, to prove the exact amount of such damage, the exporter shall pay to CCC liquidated damages promptly upon demand for each hundredweight of rice * * * not exported at the rate of $1.50 per hundredweight. The foregoing rate is agreed by the exporter and CCC to be a reasonable estimate of the probable actual damages that would be incurred by CCC."

However, the Bankrupt never availed himself of this subsidy; within a month after the first contract was entered into, Lammers notified the Indonesian Relief Mission that he would be unable to fulfill the contract, and these two parties negotiated a mutual release. Lammers, however, did not contact Commodity Credit in regard to canceling the contract but relied on his conversations with the Relief Mission (Transcript pp. 33 and 34) (Lammers testified that "it was all worked out at the Indonesian Supply Office"; I assume that he meant that the Indonesian Relief Mission received approval for the release from the Department of Agriculture and Commodity Credit, but the testimony here is very weak and not at all convincing.) This claim was filed by Commodity Credit after Bankruptcy proceedings had begun; the Bankrupt had received no notice of the claim before this time. Commodity Credit had attempted to notify him by mail; this letter was sent to the Bankrupt's California address (Mr. Lammers' broker, who handled the present transaction, had his place of business in California).

The only problem which must be solved is whether the Commodity Credit's claim is for liquidated damages or penalty. The mere fact that the term "liquidated damages" is used in the contract is not controlling; it is necessary that we analyze the facts in light of their legal meaning to determine the issue. The general rule which governs is comparatively simple. "* * * where the damages arising on a breach of a contract are *uncertain and difficult of ascertainment,* a stipulation for the payment of a designated sum, *if reasonable,* will be sustained as for liquidated damages." (emphasis supplied) Annot., 59 A.L.R. 1135 (1929) quoting Kimbro v.

Wells, 112 Ark. 126, 165 S.W. 645 (1914); for other authority see Priebe & Sons, Inc. v. United States, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947); United States v. Le Roy Dyal Co., 186 F.2d 460 (3rd Cir. 1950); Kirkland Distrib. Co. of Columbia, S. C. v. United States, 276 F.2d 138 (4th Cir. 1960); United States v. Kanter, 137 F.2d 828 (8 Cir. 1943); Annot., 38 A.L.R. 595 (1942). Cf. Annot., 59 A.L.R. 1135 (1929) and Annot., 6 A.L.R.2d 1401.

There is no doubt in my mind that the first requirement for liquidated damages is met; if ever the damages arising from a breach of a contract would be "uncertain and difficult of ascertainment" this case is it.[1] The whole transcript before the Referee is replete with testimony that it would be very difficult if not impossible to ascertain the damages which the breach of this contract caused the Government.

■■ The problem that remains to be solved then is whether the so-called liquidated damages provided for in the contract were reasonable. The Referee stated that the C.C.C. cannot produce any "credible testimony indicating that the C.C.C. sustained any actual loss as a result of the mutual cancellation of the I.R.M. contract * * *." The Referee then went on to say: "I disallow its claim because, *inter alia*, this Court may not bottom a judgment on conjecture and speculation but must have credible testimony." It is my opinion that as a matter of law the actual loss by the Government is not controlling, and the fact that the Government witnesses failed to prove an actual damage is not justification for a disallowance of the claim. Priebe & Sons v. United States, Supra; United States v. Le Roy Dyal Co., Supra; United States v. Walkof, 144 F.2d 75 (2nd Cir. 1944); 3 Collier on Bankruptcy 347 (1961).[2] To determine whether or not liquidated damages are reasonable the provision should be analyzed as of the time which the parties entered into the contract. Priebe & Sons v. United States, Supra. The fact that the Government cannot now prove how much damage the breach involved in this action has caused is nothing more than an indication of the difficulty or impossibility of determining actual damages. The time which the Referee should have looked to in determining reasonableness was the time in which the contract was entered into, and as I have already stated, the fact that the actual pecuniary loss was not as much as the contract called for does not mean that the "liquidated damages" are in reality a penalty.

We are fortunate to have two very similar cases which can serve as guides. In United States v. Walkof, Supra, Judge Augustus Hand held that where the United States had entered into a contract with the bankrupt in July 1940 for the manufacture of work suits which were to be used as war equipment, the "liquidated damages" provided for in the contract were damages and not penalty when the bankrupt did not deliver all of the

1. United States v. Le Roy Dyal Co., Supra, construed a similar contract entered into between the C.C.C. and an Irish potato dealer; Judge Goodrich held that the damages in this type of contract were incapable of "accurate estimation."

2. It seems apparent that the law of a particular state does not govern in cases where a Government contract is to be construed. Priebe & Sons v. United States, Supra; United States v. Le Roy Dyal Co., Supra. However, this gives this Court no problem since the Arkansas law in cases where damages are not readily ascertainable is in accord with the cases cited above. Robbins v. Plant, 174 Ark. 639, 297 S.W. 1027, 59 A.L.R. 1128 (1927); Hill v. Cone, 176 Ark. 697, 3 S.W.2d 985 (1928); Hall v. Weeks, 214 Ark. 703, 707, 217 S.W.2d 828 (1949); Omohundro v. Ottenheimer, 198 Ark. 137, 127 S.W.2d 642 (1959). But see Quaile & Company v. William Kelly Milling Co., 184 Ark. 717, 43 S.W. 369, 79 A.L.R. 183 (1931); McIlvenny v. Horton, 227 Ark. 83, 302 S.W.2d 70 (1957). It seems to me, however, that the last two cases cited involved damages which are ascertainable.

suits, and the United States Government was not limited to actual damages but could recover the amount stated in the contract as "liquidated damages." Judge Hand said:

"The fact that the goods which were not delivered in time could be obtained under later contracts might not obviate serious losses to the whole war effort occasioned by delay in supplies for the government's needs. Under principles long established the dangers and possible losses that might ensue if the contractor should default in its deliveries were things which the government had a right to protect itself against by a clause for liquidated damage, for they could be fairly provided for in no other way than by such an estimate. In view of the emergency and the vital necessity of obtaining war supplies promptly, we hold that the clause in the agreement under consideration has been rightly sustained as a contract provision not imposing a penalty."

The case of United States v. Le Roy Dyal Co., Supra, is even more in point. The C.C.C. contracted with the defendant to operate as a dealer to help carry out the Irish potato price support program. The contract provided that the defendant would only buy potatoes from eligible growers, and if the defendant failed to follow this provision he would be liable for $3.00 per hundredweight as liquidated damages. The Court had this to say about the reasonableness of the liquidated damages:

"The sum stipulated as liquidated damages was $3.00 per hundredweight. This was not an unduly large amount. In the record is a list of the vouchers submitted and payments made by the CCC to the defendant company under the 1947 contract. The rate per hundredweight got as high as $2.65, and sometimes it dropped down to $1.12½ but out of 183 payments made 137 were for $2.45 or more per

hundredweight. If the amount specified had been highly excessive we might have had a situation where the liquidated damage clause was to operate in terrorem as the majority thought the damages for delay in certification operated in the Priebe case. But here the amount is close enough to the general price range to take that element out of the case."

█ In the case at hand the "liquidated damages" were $1.50 per hundredweight, and there is some testimony that the price on the domestic market at the time of this contract fluctuated between nine and ten dollars, and the price per hundredweight on the export market varied between six and seven dollars. It is apparent then that in the light of the Le Roy Dyal Co. case the $1.50 provided for as liquidated damages is not as a matter of law either unreasonable or unconscionable. In establishing the Commodity Credit Corporation the United States embarked on a program which it deems important. It is certainly not difficult to surmise that the C.C.C. could suffer damages from breaches of these contracts, and I do not believe that the judiciary should deny the Government a method by which it can protect itself against damage which is not subject to definite ascertainment.

Neither does the fact that the Connell Rice and Sugar Company entered into a similar contract with the I.R.M. have any bearing on this action. The Connell contract was not related to the contract between the Bankrupt and the C.C.C. (Tr. pp. 38, 53)

█ Certainly the Government's failure to give Lammers actual notice of its claim against him is not controlling since the provision for liquidated damages was in the original contract between Lammers, Bankrupt, and C.C.C., and Lammers was responsible for knowing the terms of his contract.

The Trustee declares that he is relying on In Re Thrift Packing Company, Inc., 100 F.Supp. 907 (N.D.Tex.1951); in that case the Court held that the Government

could have no monetary loss. This action involved liquidated damages, accrued to the United States because of Bankrupt's failure to pay overtime compensation, and knowingly employing child labor. Judge Atwell held that it was not the Government but the employees who were injured, and the sum stipulated as liquidated damages for loss sustained by the United States was in fact a penalty. Since I have held that the C.C.C. certainly could have been injured by the Bankrupt's breach, the Thrift case does not control.

The Referee's findings will be reversed, and the Commodity Credit Corporation's claim against the Bankrupt's estate will be allowed.